**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Donaze GAINES, Defendant–Appellant.**

**No. 02–4378.**

United States Court of Appeals,
Sixth Circuit.

July 7, 2004.

Rehearing En Banc Denied
Spet. 17, 2004.

Joseph M. Pinjuh, U.S. Attorney's Office, Cleveland, OH, for Plaintiff–Appellee.

Paul Mancino, Jr., Mancino, Mancino & Mancino, Cleveland, OH, for Defendant–Appellant.

Before: DAUGHTREY and CLAY, Circuit Judges; and MCCALLA, District Judge.*

## OPINION

MCCALLA, District Judge.

Donaze Gaines appeals his conviction for possession with intent to distribute cocaine base and for being an armed career criminal. He challenges his conviction on a number of grounds, including failure to receive a speedy trial, denial of his motion to suppress evidence obtained at the apartment where he was arrested, denial of his motion to suppress his in custody statements, denial of his right to due process as a result of errors during trial, and failure to instruct on the lesser included offense of possession. He also claims he was denied due process of law when the trial court ruled that it had no authority to depart downward in sentencing based on his prior cooperation and because of the trial judge's participation in plea negotiations. For the reasons set forth below, we AF-FIRM Mr. Gaines' conviction and sentence.

## I. BACKGROUND

On October 25, 2001, Detective James Cudo of the Cleveland Police Department received information from a confidential informant that Donaze Gaines intended to purchase at least nine ounces of crack cocaine. Based upon this information, Detective Cudo sought and received a warrant to search the premises at 1784 Alcoy Avenue, from which Mr. Gaines allegedly sold crack cocaine. This was a multi-family residence in which Mr. Gaines allegedly lived in the upstairs unit.

Upon arriving at the premises to execute the search warrant on October 30, 2001, the SWAT team attempted to enter a door in the rear of the house by breaking it down, only to discover that the door led downstairs to the incorrect unit. After leaving two officers in the downstairs apartment to clean up the improper entry, the SWAT team then searched for and located a different door in the rear of the premises and proceeded to break down that door leading to the other units in the residence. After breaking down the second door, the SWAT team proceeded down a hallway and to the top of a flight of stairs to reach a third door, which they also broke down to gain entry to the upstairs unit where Mr. Gaines was located. According to the officers on the SWAT team, the SWAT team properly knocked and announced its presence at each door before attempting forced entry into the premises. Mr. Gaines maintains that the officers did not knock and announce at any of the three doors of the residence prior to entering the apartment where he was found.

---

* The Hon. Jon P. McCalla, United States District Judge for the Western District of Tennes-see, sitting by designation.

Once the SWAT team entered the upstairs unit, the officers found and arrested Mr. Gaines, who falsely identified himself at the time as Willie Gibson, and discovered 9.55 grams of crack cocaine, two handguns, a digital scale with cocaine residue on it, and about $21,420 in cash. The officers maintain, though Mr. Gaines disputes, that they advised him of his rights pursuant to *Miranda*. The officers questioned Mr. Gaines both at the scene and at the police station. He admitted to hiding two guns in a children's dresser drawer when he heard a commotion downstairs and saw the police presence from his window. Mr. Gaines later claimed these statements were lies and that he never heard or saw the police or hid the guns in the dresser drawer. Mr. Gaines admitted attempting to flush the drugs down the toilet, although he later claimed he never made this statement to the officers and alleged that the drugs did not belong to him. Mr. Gaines also admitted that his girlfriend purchased the 0.9mm handgun found in the residence for him because he could not legally buy a weapon due to his prior felony convictions, although he later denied that the gun belonged to him.

Upon his arrest, Mr. Gaines was taken into state custody and charged with violations of Ohio's drug and weapons laws. The state speedy trial deadline elapsed while he was in custody and the state terminated its case against him. During the time he was in state custody, he cooperated with federal agents in an ongoing investigation, Operation Rolling Thunder, providing truthful and valuable information to law enforcement officers regarding drug activity in the Longwood Estates area. The federal government did not seek to prosecute him in federal court while he was cooperating with the ongoing investigation; however, he was named as an unindicted co-conspirator in that case. Ultimately, he refused to testify before a grand jury in connection with Operation Rolling Thunder and the federal government then indicted him on federal gun and drug charges based on the evidence found in the apartment at the time he was arrested. He was arraigned in federal court on February 19, 2002.

After a jury trial that commenced on July 16, 2002, Mr. Gaines was convicted in federal court of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) as well as 18 U.S.C. § 924(e). The district judge sentenced him to 327 months incarceration, finding during sentencing that she could not depart downward for his cooperation with investigators because the government did not make a motion pursuant to U.S.S.G. § 5K1.1.

## II. DISCUSSION

### A. Speedy Trial Act

#### 1. Standard of Review

Both Mr. Gaines and the United States aver that the proper standard of review for a Speedy Trial Act claim is *de novo*. This court has in the past applied two differing standards of review to Speedy Trial Act claims—*de novo* and abuse of discretion. *United States v. Cope*, 312 F.3d 757, 776 (6th Cir.2002), *cert. denied*, —— U.S. ——, 124 S.Ct. 198, 157 L.Ed.2d 130 (2003). The court applies a *de novo* standard when reviewing a district judge's interpretation of the Speedy Trial Act. *United States v. Graef*, 31 F.3d 362, 363 (6th Cir.1994). The court applies the abuse of discretion standard when evaluating a district court's use of the "ends of justice" period of excludable delay contained in 18 U.S.C. § 3161(h)(8)(A). *United States v. Sabino*, 274 F.3d 1053, 1064 (6th Cir.2001), *amended on other grounds by* 307 F.3d 446 (2002). Mr. Gaines presents both a challenge to the district court's interpretation

of the Speedy Trial Act and to the use of an "ends of justice" time exclusion, therefore, both standards are applicable to the present case. Furthermore, the court reviews findings of fact under the Speedy Trial Act for clear error. *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir.1994).

### 2. Analysis

Mr. Gaines contends that the United States failed to bring him to trial within the seventy-day period required by the Federal Speedy Trial Act, 18 U.S.C. §§ 3161–74. Section 3161(c)(1) sets forth the following speedy trial requirement:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

If this deadline is not met, the court must dismiss the indictment either with or without prejudice, 18 U.S.C. § 3162(a)(2).

Section 3161(h) sets forth periods of time excludable from the statutory seventy-day period, including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," 18 U.S.C. § 3161(h)(1)(F), and "any period of delay resulting from a continuance granted by any judge ... if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," 18 U.S.C. § 3161(h)(8)(A).

### a. Pre–Indictment Delay

■ Mr. Gaines first contends that he was denied the right to a speedy trial due to pre-indictment delay. He was initially arrested and held in state custody on October 30, 2001. According to the parties, the state's speedy trial deadline expired on January 30, 2002. However, the state did not indict Mr. Gaines and terminated his case on February 15, 2002. The federal government indicted Mr. Gaines on February 6, 2002. He remained in state custody until Judge O'Malley signed a writ of habeas corpus ad prosequendum on February 12, 2002 that required the marshal to bring Mr. Gaines to federal court for arraignment on February 19, 2002.

Mr. Gaines contends that he was arrested through the joint cooperation of the Cleveland police and Special Agents working for the United States. At the time he was held in state custody, he maintains that he was actually subject to federal prosecution and that "[t]he manipulation of the proceedings in the state court was a ruse to avoid the Federal Speedy Trial Act." Therefore, he argues that the federal speedy trial deadline expired in this case because of the time he spent in state custody.

According to previous Sixth Circuit decisions, "only federal arrest, as distinct from state arrest, triggers the protections of the Speedy Trial Act." *United States v. Copley*, 774 F.2d 728, 730 (6th Cir.1985). "To define a federal arrest for purposes of the Speedy Trial Act, courts have held uniformly that one was not arrested within the intendment of the Speedy Trial Act until he be taken into custody after a federal arrest for the purposes of responding to a federal charge." *Id.* (internal quotation marks omitted). However, it is true that where a state arrest and detention are used as a device to restrain a defendant until the federal authorities

choose to prosecute, the time the defendant spends in state custody can be included in the calculation of time under the Federal Speedy Trial Act. *Id.* ("There is no indication that the detainer was used in this case as a device to temporarily restrain Copley while federal authorities contemplated bringing charges.") (citing *United States v. Cordova*, 537 F.2d 1073, 1075–76 (9th Cir.1976)). *See United States v. Mayes*, 552 F.2d 729, 734 (6th Cir.1977) (finding, in the context of a delay in bringing the defendant before a magistrate judge, that "if the pre-arraignment detention proves to be non-federal, the Government will be relieved of any obligation to justify the delay unless [the defendant] can demonstrate that a 'working arrangement' existed between the local police and the federal authorities designed to facilitate federal interrogation of suspects in violation of Federal Rule of Criminal Procedure 5(a)").**

Upon a careful review of the district court's hearing on the motions to dismiss and suppress in this case, it is clear that the district judge set forth a very complete and accurate description of the facts in her order denying Mr. Gaines' motion to dismiss. In sum, Detective Cudo of the Cleveland Police received information from a confidential informant regarding Mr. Gaines. He was arrested on October 30, 2001, by a Cleveland Police Department SWAT team, at which time they seized cocaine, two handguns, a scale with cocaine residue on it, and a large amount of cash. The federal government was not involved in the pre-arrest investigation, although Special Agent Waldron working for the U.S. Department of Housing & Urban De-

velopment had also received the same information regarding Mr. Gaines from the same informant. No federal officers were present at the time of the arrest.

After he arrested Mr. Gaines, Detective Cudo informed Special Agent Waldron, and also Special Agent Sercer of the Department of Alcohol, Tobacco & Firearms ("ATF"), because the Cleveland Police and the federal government had been working together on Operation Rolling Thunder to investigate the illegal drug trade at Longwood Estates. Detective Cudo, Special Agent Waldron, and Special Agent Sercer all interviewed Mr. Gaines on the day he was arrested.

Mr. Gaines was charged with state law crimes in Ohio, but the federal government did not indict him at that time. The ATF apparently prepared a report on November 27, 2001, indicating that he had violated several statutes, but because he was providing truthful and useful information in the Longwood Estates investigation the federal government did not indict him. However, when Mr. Gaines refused to testify before a federal grand jury in connection with Operation Rolling Thunder in January of 2002, the federal government decided to prosecute him. He was subsequently indicted in federal court on February 6, 2002.

As the district judge noted in her July 3, 2002 order denying the speedy trial motion, there is no indication that the state and federal governments had a "working arrangement" regarding the arrest and detention of Mr. Gaines as required by *United States v. Mayes*, 552 F.2d at 734. Al-

** *See also United States v. Odom*, 1994 U.S.App. LEXIS 34072, at *7–*9 (6th Cir. Nov. 29, 1994) (unpublished) (discussing the Speedy Trial Act and approving of idea that a defendant's due process rights are not violated absent evidence that state arrest is a temporary device to hold the defendant until prosecution by federal authorities); *United States v. Taylor*, 1994 U.S.App. LEXIS 28344, at *5–*6 (6th Cir. Oct. 23, 1992) (unpublished) (finding that a "state arrest does not trigger the Speedy Trial Act" even where an agent of the ATF knew about the arrest by the local police).

though Detective Cudo informed Special Agents Waldron and Sercer of Mr. Gaines' arrest, the mere fact that state and federal authorities offered each other information is not sufficient to support Mr. Gaines' claim that he was effectively in federal custody. The Supreme Court has previously stated that "such routine cooperation between local and federal authorities is, by itself, wholly unobjectionable: 'Only by such an interchange of information can society be adequately protected against crime.'" *United States v. Alvarez-Sanchez,* 511 U.S. 350, 360, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) (quoting *United States v. Coppola,* 281 F.2d 340, 344 (2d Cir.1960) (en banc)). Furthermore, the fact that Mr. Gaines' counsel conferred with the Assistant United States Attorney, Mr. Pinjuh, after his arrest adds nothing to Mr. Gaines' argument. Mr. Pinjuh made clear that the federal government sought Mr. Gaines' cooperation and agreed to advise the state prosecutors of his cooperation for consideration at sentencing in connection with the *state* charges. The federal government did not seek to indict him until January, 2002 when he refused to testify before the grand jury. Had he continued to cooperate, it does not appear that he would have been indicted in federal court. Therefore, there is no reason to attribute the time Mr. Gaines spent in state custody to the federal government for purposes of the Federal Speedy Trial Act. Mr. Gaines remained in state custody subject to state charges through February 19, 2002. The federal speedy trial clock did not begin to run until he was arraigned in federal court on February 19. The district judge properly denied the motion to dismiss based upon pre-indictment delay.

### b. Extension of Speedy Trial Time

In addition to his complaints regarding pre-indictment delay, Mr. Gaines argues on appeal that the speedy trial time was unlawfully extended after his February 19, 2002 arraignment. He argues that he was not present and did not consent to a continuance during an April 17, 2002 hearing at which no court reporter was present and during which his counsel of record was allowed to withdraw. Furthermore, with respect to the government's May 1, 2002 request for a continuance, Mr. Gaines argues that he was never properly served with the request because the government sent it to the wrong attorney. Finally, he argues that the district judge did not make the findings required for an "ends of justice" delay under 18 U.S.C. § 3161(h)(8)(A) when she granted the government's May 1, 2002 request for a continuance.

The seventy-day time limit imposed by the Speedy Trial Act began to run on February 19, 2002, when Mr. Gaines was arraigned in federal court. Absent any exclusion, the speedy trial deadline would have been April 30, 2002. Mr. Gaines went to trial on July 16, 2002. Although he contends that his speedy trial time expired on April 30, 2002, certain exclusions are clearly applicable. The twenty days during which his attorney's motion to withdraw remained pending (i.e., from March 29, 2002 until April 17, 2002) is excludable pursuant to § 3161(h)(1)(F). Despite Mr. Gaines' arguments that he never received a copy of his attorney's motion to withdraw, it is evident from transcripts of hearings before the district court that he was aware of his attorney's withdrawal on April 17, 2002 and in fact sought to have counsel withdraw from representing him. The new speedy trial deadline after the district court decided this motion was May 20, 2002. Moreover, in response to the government's May 1, 2002 motion to continue, the district judge did make the findings required for an "ends of justice" delay in her order dated May 3, 2002, which continued the trial until May 20, 2002. Therefore, this period of time also is ex-

cluded. Mr. Gaines argues that this period should not be excluded because the government served his former counsel with the motion to continue, but he never received a copy in accordance with Federal Rule of Criminal Procedure 49. However, even if this time period is not excluded because the government failed to properly serve Mr. Gaines with the motion, a speedy trial dismissal is not warranted. Mr. Gaines appeared before the district judge again on May 13, 2002 with new counsel. At that time, he clearly waived his speedy trial rights until the next scheduled trial date of July 16, 2002. At a minimum, seven days remained under the Speedy Trial Act after the May 13 hearing and dismissal was not required.

### B. Suppression Motions

#### 1. Standard of Review

This court reviews the district court's ruling on a motion to suppress using a mixed standard of review. "Findings of fact supporting the court's decision are reversed only if they are clearly erroneous. The court's final determination as to the reasonableness of the search is a question of law reviewed de novo." *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003).

#### 2. Analysis

##### a. Probable Cause for Issuance of the Warrant

█ In connection with his motion to suppress, Mr. Gaines first contends that the Ohio judge lacked sufficient probable cause to issue the search warrant. Applying a totality of the circumstances test, the Supreme Court has stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... [concluding]' that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1971)). Furthermore, the Supreme Court has also instructed that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)).

Mr. Gaines argues that Detective Cudo did not sufficiently corroborate the information in the warrant. However, as the district judge noted in her order, Detective Cudo's corroborative efforts "included establishing that: (1) Gaines lived where the informant said he did; (2) Gaines had an outstanding Sandusky drug-related arrest warrant, as the informant had predicted; (3) Gaines drove the type of car the informant had predicted; (4) Gaines's trash contained baggies with cocaine residue; and (5) Gaines had a history of drug-related convictions." Clearly, probable cause existed for the issuance of the warrant and the district judge properly denied Mr. Gaines' motion to suppress based on this argument.

##### b. Failure to Knock and Announce

█ Mr. Gaines also challenges the district court's denial of his motion to suppress on the grounds that the officers failed to properly knock and announce be-

fore entering his apartment. This challenge presents the most difficult question before the court on appeal.

This court has articulated the knock and announce rule as follows:

> [Before the police execute a warrant] they must identify themselves as police and indicate that they are present for the purpose of executing a search warrant . . . Once having given the required notice, the officer must wait a reasonable period of time before he may break and enter into the premises to be searched.

*United States v. Spikes*, 158 F.3d 913, 925 (6th Cir.1998) (alterations in original). "Absent certain exigent circumstances, it is unreasonable under the Fourth Amendment for an officer to enter a dwelling without first knocking and announcing his presence and authority." *United States v. Dice*, 200 F.3d 978, 982 (6th Cir.2000). "The focus of the knock and announce rule is properly not on what magic words are spoken by the police, or whether the police rang the doorbell, but rather on how these words and other actions of the police will be perceived by the occupant. The proper trigger point, therefore, is when those inside should have been alerted that the police wanted entry to execute a warrant." *Spikes*, 158 F.3d at 925 (internal citation and quotation marks omitted).

This court has declined to adopt a *per se* rule regarding the amount of time officers must wait to enter a home after they have announced their presence in order for their actions to be reasonable. *United States v. Pennington*, 328 F.3d 215, 220 (6th Cir.2003). The law in this circuit requires "only that the officers' overall actions be reasonable, not that they wait a prescribed length of time before forcible entry." *United States v. Pinson*, 321 F.3d 558, 566 (6th Cir.2003).*** Knock and announce violations require suppression. *Dice*, 200 F.3d at 984.

The SWAT team initially used a forced entry to gain access to the incorrect unit in the residence. The first unit accessed was a downstairs unit occupied by Coanna McGhee, whereas the warrant had been issued for the upstairs unit where Mr. Gaines was located. Ms. McGhee claims she never heard the officers knock on her door or identify themselves as police officers serving a warrant before they broke down her door. After realizing the mistake, the SWAT team left to enter the appropriate unit. *Several minutes* apparently passed between the time the officers mistakenly entered Ms. McGhee's apartment and the time they accessed Mr. Gaines' apartment. The officers testified, and Ms. McGhee confirmed, that the officers made a substantial amount of noise moving around and talking in the building after the improper entry into her apartment.

Upon locating the entry to the upstairs unit, the SWAT team had to proceed through two doors to gain access the apartment where Mr. Gaines was found. Ms. McGhee stated that she did not hear the officers knock and announce at either of the other two doors they broke down to gain entry to the apartment where Mr. Gaines was staying. She did hear noise and voices, but she was focused on cleaning up the mess in her apartment at the time. Mr. Gaines also claims he did not hear the officers knock and announce prior

***In the Supreme Court's most recent opinion regarding the knock and announce rule, the Court found that a fifteen to twenty second delay after the officers knocked and announced their presence was sufficient. The officers had executed a warrant to search for drugs and once they announced their presence it "started the clock running toward the moment of apprehension that [the defendant] would flush away the easily disposable cocaine." *United States v. Banks*, 540 U.S. 31, 124 S.Ct. 521, 526, 157 L.Ed.2d 343 (2003).

to their forced entry through the two doors leading to the apartment in which he was located.

By contrast, both officers who testified at the suppression hearing indicated that they knocked on the door and announced "police search warrant" prior to battering the doors to either Ms. McGhee's or Mr. Gaines' residence. Assuming the officers' statements are correct, which the district judge appears to have done, the officers admitted that they waited no more than a few seconds before breaking down the doors. As the district judge noted, from reviewing the testimony it appears as though the officers were essentially breaking down the door while they were simultaneously yelling "police search warrant." At most, the elapsed time between when the officers knocked on each door and when they broke it down was two or three seconds.

Acknowledging these facts, the district judge noted that if she had been asked to evaluate the legality of the entry into Ms. McGhee's apartment, she would have found the search unconstitutional because the time between the announcement "and the officers' actual breach and entry through the door was barely enough to allow anyone inside the house to stand up from sitting in a chair, much less open the door." However, she concluded that the officers made the "fortuitous mistake" of entering the wrong apartment first.

Mr. Gaines admitted during an interview with Detective Cudo that he heard the commotion downstairs when the SWAT team mistakenly entered Ms. McGhee's apartment. Mr. Gaines also stated that he looked out the window and saw the police presence, at which time he hid the guns in a children's dresser drawer and unsuccessfully attempted to flush the cocaine down the toilet. The noise from the forced entry into Ms. McGhee's apartment and the time interval before the SWAT team

forced entry into Mr. Gaines' apartment led the district judge to conclude that no knock and announce violation had occurred because Mr. Gaines had "actual knowledge" that the police were at the residence and attempting to gain entry. The district judge noted that "Gaines clearly had plenty of time to respond to the officers' demand for entry by opening his door peaceably, instead of forcing the police to batter it down." Although Mr. Gaines now denies that the guns found in the apartment belonged to him and further denies that he attempted to dispose of the drugs in the toilet before the police arrived, it seems rather obvious that an individual would not place drugs in the toilet unless he or she intended to dispose of them. Based on this evidence and Detective Cudo's testimony, the district judge's conclusion that Mr. Gaines was aware of the police presence in his building, and had sufficient time to take action in response to it, is well supported.

On appeal, Mr. Gaines contends that the SWAT team's mistaken forcible entry into the downstairs apartment did not legally serve to put him on notice that the officers sought entry into the apartment where he was located, as opposed to the neighbor's apartment. Mr. Gaines argues that although he may have heard the commotion downstairs and seen the police presence from his window, allegedly alerting him to stash the guns and attempt to flush the drugs down the toilet, these facts do not imply the officers gave him proper notice of their intention to enter his apartment and execute the search warrant because they actually attempted to enter the wrong apartment. He contends that the SWAT team was required to knock and announce on his door and then wait a reasonable time before forcing entry to the apartment. He maintains that his later statements indicating that he was aware of the police and sought to hide the guns and

drugs do not retroactively provide the officers with a justification for their failure to properly knock and announce at the entry to the apartment where he was located.

Mr. Gaines relies on this court's decision in *United States v. Bates*, 84 F.3d 790, 797 (6th Cir.1996), in which the court concluded that the search in question violated the knock and announce rule. The officers banged on the front door with a battering ram to draw the attention of those inside the apartment to the front door. Simultaneously, other officers ascended a ladder to the second floor balcony and accessed the apartment. The officers did not knock and announce prior to breaking down the front door to the apartment. The officers climbing the ladder stated that they were law enforcement officers as they were climbing up the ladder. *Id.* at 793. The government claimed that exigent circumstances, including a reported barricade, fear that the inhabitants would dispose of the drugs, and the possible presence of a weapon, justified the failure to knock and announce. This court disagreed and found that the police conduct violated the knock and announce rule. *Id.* at 796–97.

Whether the conduct of the police complies with the knock and announce rule is a case by case factual inquiry. The facts of this case are best analyzed in comparison to two more recent opinions from this court regarding the knock and announce rule. In *Pinson*, 321 F.3d at 568, cited by the government, this court concluded that the officers' knock and announce actions were reasonable where "a number of events occurred prior to the first knock that should have alerted the occupants ... that the police would be seeking entry to the premises." These events included officers arriving in a marked patrol car with its blue lights on and ordering a female on the front porch to get down. *Id.* The officers then knocked on the door and waited approximately five to ten seconds

before entering the residence. *Id.* As in this case, the officers had to proceed through two doors in order to enter the inner residence. *Id.*

In *Spikes*, 158 F.3d at 927, also cited by the government, the court found that the police officers' use of a bullhorn to alert residents inside a home to the execution of a search warrant fifteen to thirty seconds prior to entry satisfied the knock and announce rule. The bullhorn made sufficient noise to alert neighbors to the execution of the warrant, drawing them from their homes to observe execution of the warrant. *Id.* The court also noted that the elapsed time between when the officers actually knocked on the door and their subsequent entry into the residence was only four seconds. *Id.* at 919.

The district court's decision denying the motion to suppress is in accordance with this circuit's case law. In *Pinson* and *Spikes*, this court found that the short amounts of time between knock and announce and forced entry were sufficient. Notably, in these cases, as in the appeal presently before the court, events preceding the forced entry should have notified the occupants to the police presence and the impending entry. Mr. Gaines' reliance on *Bates* is unavailing because the facts of that case make clear that the officers made no attempt whatsoever to knock and announce prior to their forced entry through the front door and balcony of the apartment, nor were the inhabitants aware of the police prior to entry.

In this case, the evidence presented to the district court shows unequivocally that Mr. Gaines had *actual* knowledge of the SWAT team's presence several minutes prior to the forced entry into his residence. Moreover, given that he had sufficient time to hide two guns and attempt to flush crack cocaine down the toilet, he clearly had sufficient time to peaceably open the

door for the officers. While the police conduct in mistakenly executing the warrant at first on the wrong apartment without a proper knock and announce certainly leaves something to be desired, the court affirms the district court's decision to deny the motion to suppress.

### c. In Custody Confession

Mr. Gaines next challenges the district court's decision denying the motion to suppress his in custody confession. He claims both that he was not given his *Miranda* warnings and, even if he received the warnings, he did not knowingly and voluntarily waive them.

■ Detective Cudo, whom the district judge found to be truthful, testified that he gave Mr. Gaines *Miranda* warnings first at the residence when he was arrested, and again at the police station before he was questioned. Special Agent Waldron confirmed that Detective Cudo gave Mr. Gaines *Miranda* warnings prior to questioning at the station. According to both Detective Cudo and Special Agent Waldron, Mr. Gaines refused to sign a form waiving his rights, but he nonetheless agreed to talk to them. The district judge arrived at the entirely reasonable conclusion that Detective Cudo gave Mr. Gaines *Miranda* warnings not once, but twice. The district judge found Mr. Gaines' statement that he did not receive *Miranda* warnings "not credible." Her conclusion is well supported, and this court has no reason to disturb her findings of fact on this issue.

■ Mr. Gaines also argues that his confession was not voluntary. He contends that the *Miranda* warnings were deficient because Detective Cudo failed to advise him that he had the right to have counsel appointed *prior* to questioning or that he could terminate the questioning at any time. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694

(1966); *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (recognizing that a "critical safeguard" set forth in *Miranda* is a person's "right to cut off questioning"). To the contrary, Detective Cudo testified to advising Mr. Gaines that "he had the right to remain silent. . . . That he had the right to have an attorney present during questioning." Furthermore, all of the evidence in this case leads to the conclusion that Mr. Gaines voluntarily spoke with the police after receiving adequate *Miranda* warnings, and gave no indication that he wanted to terminate the questioning. *United States v. Davis,* 459 F.2d 167, 168–69 (6th Cir.1972) (finding *Miranda* warnings adequate although defendant was not specifically advised that he could terminate questioning even after the questioning had begun).

■ Mr. Gaines also makes much of the fact that although he was arrested on October 30, 2001, and interviewed on both October 30 and October 31, he apparently was not brought before a court until November 2, 2001. Relying on Ohio Rule of Criminal Procedure 4(E)(2), he argues that he should have been brought before a judge "without unnecessary delay" and that delay in bringing him before a judge supports his argument that the confession was not voluntary. He asks that the court use its supervisory authority over the criminal justice system to suppress the statements based on this three day delay. *Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (reversing conviction where defendant was not arraigned without unnecessary delay); *McNabb v. United States,* 318 U.S. 332, 342–47, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

Despite Mr. Gaines' arguments that he was held for three days prior to being brought before a judge, the district judge concluded that "there are no indicia that

any law enforcement agent compelled him to make any statements against his will." Upon careful review of the suppression hearing transcript, there is no evidence indicating that she erred in this determination. Mr. Gaines spoke voluntarily with investigators at the scene of his arrest and for an hour and a half after he arrived at the police station on the day of his arrest. The following day, he was again interviewed and when his attorney arrived and requested that the interview stop, the officers ceased questioning Mr. Gaines. The record contains no evidence of coercive tactics or duress, nor does it offer an indication that Mr. Gaines' statements were the product of anything other than a desire to cooperate in the hope of receiving more lenient treatment. Furthermore, it appears that the delay occurred after Mr. Gaines had already submitted to questioning. This court has previously noted that "the relevant period of delay is measured from the time of arrest to the giving of the statement, and a period of illegal detention following the statement will not nullify a 'prompt acknowledgement by an accused of his guilt. . . .'" *Davis,* 459 F.2d at 169–70 (quoting *United States v. Mitchell,* 322 U.S. 65, 69, 64 S.Ct. 896, 88 L.Ed. 1140 (1944)). Mr. Gaines' confession was voluntarily made shortly after his arrest and the later delay in bringing him before a judge does not render his earlier confession inadmissible.

### C. Trial Errors

### 1. Cross–Examination of Darrin Fears

#### a. Standard of Review

Whether the prosecutors actions or statements constitute prosecutorial misconduct rendering the trial fundamentally unfair is a mixed question of law and fact, requiring *de novo* review. *United States v. Francis,* 170 F.3d 546, 549 (6th Cir. 1999); *United States v. Clark,* 982 F.2d 965, 968 (6th Cir.1993).

#### b. Analysis

■ Mr. Gaines first claims he was denied a fair trial because the prosecutor was abusive when cross-examining defense witness Darrin Fears. Mr. Fears owned and rented the units in the building at 1784 Alcoy Road in which Mr. Gaines was arrested. Mr. Gaines called Mr. Fears as a witness in his defense to testify that Mr. Gaines did not live in the building.

Mr. Gaines claims that the government attorney improperly cross-examined Mr. Fears regarding convictions that were more than ten years old in violation of Federal Rule of Evidence 609(b). He also asserts that the prosecutor improperly cross-examined Mr. Fears by assuming facts regarding recent convictions, the use of aliases, and the use of multiple social security numbers, for which the prosecutor did not have a good faith belief and for which the prosecutor did not provide verification.

With respect to the convictions that were more than ten years old, the district judge correctly rule that they are admissible under Rule 609(b) as long as less than ten years had passed since the witness was released from confinement or the period of his parole or probation had expired. Because Mr. Fears' sentence ended within the ten-year period, there was no prosecutorial misconduct and the district judge properly allowed the questions. Furthermore, except for a question regarding a conviction for receiving stolen property, defense counsel did not object to any of the prosecutor's questions during trial; defense counsel even inquired into one conviction from 1990 on direct examination.

■ With respect to impeachment regarding the use of aliases and false social security numbers, Mr. Gaines must show that the prosecutor lacked a "good faith basis" for asking the questions in violation of Federal Rule of Evidence 608(b). *United States v. Zidell,* 323 F.3d 412, 426 (6th

Cir.2003). The prosecutor argues that the documentation concerning Mr. Fears' convictions also contained information regarding the use of aliases and false social security numbers. Therefore, the prosecutor had a good faith basis for asking the questions. Even if the prosecutor did not have a good faith basis for asking questions pertaining to false social security numbers and the use of aliases, Mr. Fears' credibility had already been impeached by the discussion of his prior convictions. Therefore, any error in this instance is without doubt harmless.

### 2. Right of Confrontation

#### a. Standard of Review

The court reviews evidentiary issues regarding a claim that the defendant was denied his right to confrontation in violation of the Sixth Amendment using a *de novo* standard. *United States v. Lloyd*, 10 F.3d 1197, 1216 (6th Cir.1993).

#### b. Analysis

■ Mr. Gaines claims he was denied a fair trial because the district court permitted Crystal Sills to testify regarding the lab tests performed for the Cleveland Police Forensic Laboratory to determine that the material discovered in the residence with Mr. Gaines was crack cocaine. Ms. Sills, however, had not performed the tests herself. Another examiner, Cynthia Lewis, had performed the tests, but was unavailable for trial due to a death in her family. Ms. Sills worked as technician in the laboratory performing the same types of tests as Ms. Lewis. Although the extent of Ms. Sills' involvement in the actual testing process was disputed at trial, there is no dispute concerning her review of the

test results and her ultimate endorsement of them. The district court certified her as an expert in the field over the objection of Mr. Gaines' attorney. Ms. Sills had previously been certified as an expert in three state court cases.

At the conclusion of Ms. Sills' testimony, defense counsel argued that her entire testimony should be stricken because she had not actually conducted any of the tests herself. Mr. Gaines claims that he was denied his right to confrontation and cross-examination. The district judge permitted defense counsel to argue to the jury that her testimony did not clearly establish the facts asserted, an issue defense counsel had raised on cross-examination. The district judge also noted that the government never implied that Ms. Sills conducted the tests herself, and Ms. Sills testified only that she reviewed the results for accuracy.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." The Confrontation Clause "envisions a personal examination and cross-examination of the witness." *Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quotation marks omitted), *overruled in part on other grounds by Crawford v. Washington*, —— U.S. ——, ——, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). Mr. Gaines received the opportunity to cross examine Ms. Sills regarding the laboratory reports, the tests performed, and the test results. That is all the Confrontation Clause requires.**** Any inconsistencies or questions regarding Ms. Sills' in court testimony and the tests identifying the evidence as cocaine or cocaine base would affect the weight of the evidence, rather than its admissibility.

**** Although the district judge's ruling during trial regarding the admissibility of Ms. Sills' testimony referenced an exception to the hearsay rule for a custodian of business records, i.e. Federal Rule of Evidence 803(6),

counsel indicated during oral argument that his challenge to the admissibility of the testimony did not rest on the exclusion of hearsay evidence.

Moreover, even if Ms. Sills' testimony was admitted incorrectly, the prosecutor presented substantial circumstantial evidence as to the nature of the substance, which suggests, at most, harmless error.

### 3. Prosecutorial Argument

#### a. Standard of Review

As discussed above in Section IV.C.1.a., whether the government's opening and closing remarks constitute prosecutorial conduct rendering the trial fundamentally unfair is a mixed question of law and fact requiring *de novo* review. *Francis*, 170 F.3d at 549; *Clark*, 982 F.2d at 968.

#### b. Analysis

■ Mr. Gaines claims he was denied a fair trial because the prosecutor made improper remarks during his closing statement and rebuttal. The Sixth Circuit applies the following analysis to claims of prosecutorial misconduct:

> When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal. To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury.

*Francis*, 170 F.3d at 549–50 (citations omitted).

Furthermore, in order to obtain reversal of a conviction on the grounds of impermissible prosecutorial conduct, a defendant "must show that the improper argument caused him substantial prejudice." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990). A prosecutor's remarks are improper if they express his personal opinions to the jury. *United States v. Galloway*, 316 F.3d 624, 632–33 (6th Cir.2003).

Mr. Gaines argues that the prosecutor made improper statements during closing argument and rebuttal by commenting on the evidence presented and stating that the government had proven each element of the crimes in the indictment. However, as the government argues, when taken in context, the prosecutor's remarks were clearly not improper. The prosecutor simply summarized the evidence presented to the jury during his closing and rebuttal. Moreover, considering the overwhelming evidence of guilt in this case, including Mr. Gaines' own confession to the police and federal agents, and the testimony of witnesses regarding his ownership of the charged gun, none of the allegedly improper statements by the prosecutor would actually have deprived Mr. Gaines of a fair trial.

Mr. Gaines also contends that the prosecutor stated during his opening and closing remarks that the baggies that Detective Cudo pulled from the trash outside the residence contained cocaine, whereas the evidence showed that only one of the recovered baggies tested positive for cocaine residue. In context, on several occasions the prosecutor referred to the multiple baggies Detective Cudo recovered in the trash pull, rather than stating that more than one of the baggies contained cocaine. Even assuming the prosecutor inadvertently used the word baggies to indicate that more than one contained cocaine residue, the jury heard the evidence as well as

an instruction from the judge that the statements of the attorneys are not evidence. The jury could reasonably sort out the factual difference between one baggy and multiple baggies. Moreover, as mentioned above, the evidence of guilt in this case is overwhelming and this misstatement by the prosecutor patently did not deprive Mr. Gaines of a fair trial.

### 4. Cumulative Errors

#### a. Standard of Review

"Cumulative error analysis is relevant when there were certain errors at trial which, when considered alone may not deprive a person of due process, but may cumulatively produce a trial that is fundamentally unfair." *United States v. Rich,* 2000 WL 923493, at *7, 2000 U.S.App. LEXIS 15807, at *21 (6th Cir. June 29, 2000). When the defendant does not object at trial, the alleged improper conduct is reviewed for plain error. *Carroll,* 26 F.3d at 1383 (6th Cir.1994).

#### b. Analysis

Mr. Gaines claims that seven errors made during trial cumulatively denied him the right to a fair trial. During trial, he did not move for a new trial based on the cumulative effect of the seven alleged errors.

Mr. Gaines' first three challenges are to factual evidence, specifically, the evidence that he resided at 1784 Alcoy Avenue (alleged error 1), the evidence that Detective Cudo recovered multiple plastic baggies during the trash pull, but only one contained cocaine residue (alleged error 2), and the evidence that Mr. Gaines drove a black Infiniti (alleged error 3). The basis for Mr. Gaines' legal challenge to this evidence is not clear. Counsel did not object to admission of this evidence during trial and he offers no basis for exclusion of the testimony on appeal other than Federal Rule of Evidence 602, which is clearly inapplicable. Counsel for Mr. Gaines had the opportunity to cross-examine the witnesses regarding their testimony on these points. Any challenge to this evidence should go towards weight, rather than admissibility. Therefore, there is no reason this evidence should have been excluded.

Mr. Gaines challenges the admission of certain other evidence as prejudicial, pursuant to Federal Rules of Evidence 403 & 404(b). Specifically, he challenges the admission of evidence concerning drug activities at Longwood, Cleveland, and Sandusky (alleged errors 4 & 5), the admission of Special Agent Lee Lucas' expert testimony regarding tools of the drug trade (alleged error 6), and the admission of Exhibits 10 and 11, which were photographs of the gun that he was not charged with possessing (alleged error 7).

■■■ In this case, the district judge permitted evidence of Mr. Gaines' cooperation with authorities investigating criminal activity at Longwood, Cleveland, and Sandusky to be admitted solely to explain the federal agents' reasons for questioning Mr. Gaines at the time of his arrest.*****

***** A Rule 404(b) analysis is not applicable in this case because the district judge specifically did not allow the prosecutor to introduce information regarding any prior crimes, wrongs, or acts Mr. Gaines may have committed. In fact, during the direct examination of Special Agent Waldron, the district judge sustained defense counsel's objection to one of the prosecutor's questions stating, "You did not identify specific activities by Gaines himself in Longwood as 404(b) evidence that you sought to introduce." Moreover, after the prosecutor's question, the district judge immediately issued a curative instruction to the jury stating:

> Ladies and gentlemen, I want to make clear this Defendant is on trial only for the crimes with which he is charged. The Government is not offering proof of nor has the Government accused the Defendant of other improper activity in other locations, and

Furthermore, the district judge instructed the jury as to the purposes for which this information could be considered, stating:

> The defendant is not accused in this case of engaging in drug activity in the Longwood Estates area. And this government has not—*the government has offered no evidence indicating that he has ever engaged in such activity.* The government has also offered no evidence even indicating that the defendant has any meaningful knowledge of such activity. You may not accordingly consider any references to the Longwood Estates as any evidence of the defendant's guilt with respect to the particular crimes charged in this case. *The evidence was offered to explain the progress of the investigation.* It was not relevant for any other purpose and may not be considered by you for any other purposes.

(Emphasis added.) The district judge properly admitted the evidence under Rules 402 and 403 with an appropriate limiting instruction to the jury.

█ The district judge also admitted Special Agent Lucas' testimony regarding tools of the drug trade to establish the modus operandi of drug traffickers. Police officers' expert testimony is admissible "where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *Thomas,* 74 F.3d at 682. The testimony of Special Agent Lucas was offered on the question of intent and provided an explanation for the baggies Detective Waldron recovered in the trash pull, and the presence of the scale and the guns in the apartment along with the drugs. Mr. Gaines contends that this "background" evidence was also prejudicial. Presumably, he challenges admission of this evidence under Rule 403. Pursu-

ant to Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." The district court's ruling regarding Rule 403 evidence requires balancing, which the appellate court reviews only for abuse of discretion. *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993). "District courts are given broad discretion in making a Rule 403 determination. Our review of a Rule 403 ruling is limited in that we must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.* (internal citations and quotation marks omitted). Taking the evidence in the light most favorable to the government, the admission of Special Agent Lucas' testimony is not more prejudicial than probative and was properly admitted at trial.

█ The district judge also admitted photographs of the two guns recovered at 1784 Alcoy Avenue, finding that the presence of the guns was relevant on the question of intent to distribute. Mr. Gaines contends that evidence of the second gun, which he was not charged with possessing, was prejudicial. Again, presumably his challenge to this evidence is under Rule 403. During the jury instructions, the district judge instructed the jury that although the government would argue that the presence of the second gun was relevant for other purposes in the case, the jury could not find Mr. Gaines guilty based on the second weapon. As above, this evidence was also properly admissible as it provided evidence relevant to the question of intent to distribute. The probative value of this evidence exceeded its possible prejudicial effect. Moreover, the district

---

you are not to assume from any questions that Mr. Pinjuh asked that the Defendant is guilty of any such activity, and you may not

convict of the crimes with which he is charged because of the questions or responses relating to that activity.

judge's instruction to the jury cured any possible prejudice to the defendant. Given that each of these pieces of evidence was properly admitted at trial, there is no series of cumulative errors that deprived Mr. Gaines of a fair trial.

### D. Failure to Instruct on Lesser Included Offense

#### 1. Standard of Review

The court applies an abuse of discretion standard to review a district court's refusal to give an instruction as to a lesser included offense. *United States v. Colon,* 268 F.3d 367, 373 (6th Cir.2001).

#### 2. Analysis

 Mr. Gaines challenges the district court's failure to instruct the jury as to the lesser included offense of simple possession. "[I]f a defendant asks for a lesser included offense instruction, it is generally reversible error not to give it." *United States v. Waldon,* 206 F.3d 597, 604 (6th Cir.2000). However, a defendant is not entitled to an instruction as to a lesser included offense unless: "(1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser." *Colon,* 268 F.3d at 373.

Both parties agree that simple possession is a lesser included offense of the indicted offense in this case (i.e. possession with the intent to distribute). Mr. Gaines' entire argument in favor of a lesser included offense instruction consists of two facts: (1) the amount of drugs was small, and (2) the drugs were found in a plastic bag in the toilet. He argues that the small quantity of drugs and the fact that it was in the toilet shows there was no intent to distribute.

Mr. Gaines' facts are correct, but not his argument. As the district court noted, the government presented additional testimony that the amount was too large for personal use, that when Mr. Gaines was arrested he was found with paraphernalia associated with distribution, such as the scale and guns, and that Mr. Gaines admitted to drug trafficking activity. Moreover, as the district judge noted, Mr. Gaines' defense rested on the proposition that he did not live at the apartment, nor did he regularly stay there, and the drugs were not his. This belies his request for an instruction as to simple possession. The district court concluded:

> [N]o reasonable jury could convict the defendant of the lesser included offense and not convict the defendant of . . . the offense as charged. In other words, if the jury accepts the defendant's theory that he did not have control over the drugs in the apartment, then the defendant would be acquitted of both charges. If the jury rejects that conclusion, then the substantial evidence of an intent to distribute is such that it would prohibit a lesser included offense instruction in this particular case.

Applying an abuse of discretion standard, the district judge's conclusion is supported by the evidence presented at trial.

### E. Sentencing

#### 1. Standard of Review

The court reviews *de novo* the application of the U.S. Sentencing Guidelines to a particular set of facts as a question of law, but does not ordinarily review a district court's decision not to depart downward from the Guidelines Range. *United States v. Truman,* 304 F.3d 586, 589 (6th Cir. 2002). However, "[b]ecause the question of whether discretion exists is purely a

question of law," the court will review such a finding using a *de novo* standard and "will vacate a sentence where the district court erroneously believed that it lacked any authority to depart downward as a matter of law." *Id.*

### 2. Analysis

Mr. Gaines challenges the district court's conclusion that it could not grant him a downward departure based on his prior cooperation. As part of his argument regarding sentencing, he also maintains that the district judge's involvement in plea negotiations compromised her impartiality in sentencing.

### a. Failure to Depart Under U.S.S.G. § 5K1.1

■ Mr. Gaines objected to the Presentence Investigation Report and filed a motion with the district court prior to sentencing arguing that he was entitled to a six-level downward departure under the U.S. Sentencing Guideline Manual § 5K1.1 because of his assistance in providing information regarding Operation Rolling Thunder. He did not request a departure pursuant to § 5K2.0, which allows for departure downward where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

As the district judge correctly noted, a substantial assistance departure under § 5K1.1 may only be granted upon the government's motion. *Wade v. United States,* 504 U.S. 181, 185, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992); *United States v. Moore,* 225 F.3d 637, 644 (6th Cir.2000). Thus, Mr. Gaines was not entitled to a departure based on § 5K1.1 because the government did not make a motion for a departure in this case.

Mr. Gaines cites to *Truman,* 304 F.3d at 592, in support of his appeal. In *Truman,* this court held that the district court inappropriately determined that a government motion was required for a departure under facts controlled by § 5K2.0, rather than § 5K1.1. *Id.* As noted above, Mr. Gaines did not make a motion pursuant to § 5K2.0 either prior to or during sentencing. Moreover, Mr. Gaines' initial cooperation involved the investigation and/or prosecution of other persons—the precise case governed by § 5K1.1. Therefore, *Truman,* which is a § 5K2.0 case, is inapplicable to the issue before this court. Moreover, even if Mr. Gaines had requested a departure pursuant to § 5K2.0, the district judge indicated during sentencing that a downward departure would not be appropriate because he repeatedly turned down requests to testify before the grand jury regarding Operation Rolling Thunder.

### b. Judicial Participation in Plea Negotiations

■ The final issue before the court is the effect of the district judge's participation in plea negotiations. The government did not respond to this argument on the merits, choosing instead to argue that Mr. Gaines waived his right to appeal this issue by failing to raise it before the district court. However, this court has held "that judicial participation in plea negotiations constitutes 'plain error' under Rule 52(b) that may be corrected by an appellate court although not raised below." *United States v. Sammons,* 918 F.2d 592, 601 (6th Cir.1990); *see also United States v. Markin,* 263 F.3d 491, 496 (6th Cir. 2001). Therefore, the court must consider the issue on appeal. Mr. Gaines contends that the district judge inappropriately participated in the plea negotiations on two separate occasions, first during a pretrial conference on July 8, 2002, and again during the final pretrial conference held on July 10, 2002.

Federal Rule of Criminal Procedure 11(c)(1) states in part that "[t]he court must not participate in [plea agreement] discussions." ****** "Under Rule 11, the judge's role is limited to acceptance or rejection of the plea agreement after a thorough review of the relevant factors; the judge should not participate in the plea bargaining process." *United States v. Harris*, 635 F.2d 526, 528 (6th Cir.1980). This court has previously stated, "It is the discretion to impose either a lenient or lengthy sentence that lies at the heart of the coercive potential inherent when a judge participates in plea negotiations. In our view, this rationale applies ... [when] the judge is negotiating an agreement to plead guilty...." *Markin*, 263 F.3d at 498 (citation omitted). "The trial court must not penalize the defendant for exercising his constitutional right to plead not guilty and go to trial; whether or not the defendant exercises his right to trial must have no bearing on the sentence he receives." *Harris*, 635 F.2d at 529. However, because it is not a constitutional rule, Rule 11(c)(1) "does not necessarily invalidate every instance of judicial participation in the negotiation of a guilty plea...." *Alvarez v. Straub*, 21 Fed.Appx. 281, 283 (6th Cir.2001) (unpublished).

The record in this case indicates that, at most, the district judge suggested to the prosecutor that he speak with his supervisors regarding an enhanced plea offer for Mr. Gaines based on his earlier cooperation. Her comments during the pretrial conference and the sentencing do not in any way indicate that she harbored any resentment towards Mr. Gaines or sought to penalize him during trial or sentencing for failing to accept the proposed plea agreement from the government. Moreover, the district judge cited the following

factors when deciding to sentence Mr. Gaines in the maximum range: (1) the defendant's obstruction of justice, (2) the defendant's perjury during the suppression hearing, (3) the defendant's "particularly offensive and particularly violent" criminal history, and (4) the defendant's "absolute total absence of any remorse with respect to any of his conduct." Factually, these findings are well supported in the record and would certainly justify a sentence at the high end of the range.

## III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** Mr. Gaines' conviction and sentence for possession with intent to distribute cocaine base and for being an armed career criminal.

---

****** Prior to the year 2002, this provision was found in Rule 11(e)(1). Rule 11 was amended and reorganized to make it more understandable. The changes were meant to be stylistic. Fed.R.Crim.P. 11, advisory committee's note (2002 Amendments).